UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES MALIK PAGE,

                                    Plaintiff,

            vs.                                                      9:09-CV-68
                                                                     (FJS/ATB)
SYED HAIDER-SHAH,

                                    Defendant.

_____

JAMES MALIK PAGE, Plaintiff *pro se*
ROGER W. KINSEY, Asst. Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report

and Recommendation by Senior District Judge Frederick J. Scullin, Jr., pursuant to 28

U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).  After Magistrate Judge Di

Bianco's retirement, the case was reassigned to me by Chief District Judge Norman A.

Mordue on January 4, 2010. (Dkt. No. 17).

        In this civil rights complaint, plaintiff alleges that defendant Haider-Shah

denied plaintiff constitutionally adequate medical care. (Dkt. No. 1).  Plaintiff seeks

substantial monetary and injunctive relief.  Presently before the court is defendant's

motion to dismiss the action for failure to state a claim pursuant to FED. R. CIV. P.

12(b)(6). (Dkt. No. 9).  Plaintiff has responded in opposition to the motion. (Dkt. No.

16).  For the following reasons, this court agrees with defendant and recommends

dismissal of this action for failure to exhaust administrative remedies.

**DISCUSSION**

I.   **Facts and Procedural History**

In a very lengthy complaint, containing twelve numbered causes of action, plaintiff essentially claims that defendant Dr. Syed Haider-Shah denied plaintiff constitutionally adequate medical care while plaintiff was incarcerated at Marcy Correctional Facility (Marcy) from March 6, 2008 until he was transferred to Mid-State Correctional Facility (Mid-State) on May 27, 2008. (Compl. at 2-12) (Dkt. No. 1).

Plaintiff alleges that he was transferred to Marcy on March 6, 2008, and that he was screened upon his arrival by the Marcy medical department. (Compl. at 2). The screening resulted in a finding that plaintiff was "in good health," his weight was 154, he had no "other illnesses besides his [HIV]," and that the HIV was "fine and stable." *Id.* (brackets in original). Plaintiff claims that after his arrival at Marcy, he "worked-out everyday lifting weights, hitting the heavy bag and running." *Id.*

On March 15, 2008,[1] plaintiff began to feel ill, suffering from chills, fever, and body aches. *Id.* Plaintiff was seen by a nurse at "sick call," who told plaintiff that he had a slight fever and a cold, gave him some cold tablets, and sent him back to his housing unit. (Compl. at 3). Plaintiff states that he did not get any better and went back to sick-call on March 19 or 20, 2008. *Id.* At that time, plaintiff was suffering from body aches, chest pains, and loss of strength. *Id.* The nurse put plaintiff on the

---

[1] The complaint states that the date was March 15, **2007**, but this is clearly a typographical error since plaintiff did not arrive until March 6, **2008.** (Compl. at 2).

list to see the doctor. *Id.*

Plaintiff states that as a result, he was examined by defendant Dr. Haider-Shah.[2]
Dr. Haider-Shah told plaintiff that he had either "the flu or walking pneumonia" and
ordered x-rays and antibiotics. (Compl. at 3). Plaintiff still did not get better and
states that, although he went to sick-call "numerous times," he just kept getting worse.
*Id.* At one of the sick-call visits, the nurse took plaintiff's weight,[3] gave plaintiff more
cold tablets, and put plaintiff on the list to see the doctor again. *Id.* The date is unclear
from the complaint, but plaintiff states that when he saw Dr. Haider-Shah the second
time, the doctor saw that plaintiff's weight was down to 136 pounds, administered
some medical tests, gave plaintiff some "supplements," and made an appointment for
plaintiff to see "the HIV/AIDS Specialist" to determine whether plaintiff's HIV
infection was causing his current symptoms. (Compl. at 4). Plaintiff was examined by
the "Specialist and was given an examination that same day . . . ." *Id.* The tests
showed that plaintiff's "TC4-Cell Count and Viral Load Count" were "both good." *Id.*
According to the "Specialist," plaintiff's HIV infection was not the cause of his
symptoms, and that his "Counts were real good." *Id.*

Plaintiff states that he continued to lose weight and became so weak that he
could no longer make it to the mess hall to eat. *Id.* Plaintiff saw Dr. Haider-Shah
again and told him that he was becoming so weak that even small objects would fall

_____

[2] No date for this examination is specified in the complaint, however, it appears that plaintiff
was examined by the doctor shortly after the nurse put plaintiff on the list.

[3] Plaintiff states that his weight went down to 144 pounds. (Compl. at 3).

out of his hands. (Compl. at 5).  Plaintiff claims that Dr. Haider-Shah examined him and made various observations, including that plaintiff could not apply pressure with his hands, his "incimes [sic]"[4] were very high, his muscles were beginning to waste away, and plaintiff had lost approximately 39 pounds in the last three weeks. *Id.*  Dr. Haider-Shah ordered more blood tests and prescribed a medication for plaintiff that was designed to help him gain back some weight. *Id.*

Plaintiff states that the medication did not work, and instead caused stomach pain and facial swelling, forcing plaintiff to stop taking it. *Id.*  Plaintiff states that his condition continued to get worse. *Id.*  He states that he began falling down, was not able to sleep, and was in pain. *Id.*  Plaintiff continued to go to sick-call and complain that he was not getting "proper care and medical treatment." *Id.*  Plaintiff states that he persisted in asking Dr. Haider-Shah what was wrong, but that the doctor did not respond to plaintiff's questions. (Compl. at 6).  Plaintiff alleges that he lost another six pounds, making a total weight loss of 45 pounds. *Id.*  Plaintiff claims that he asked Dr. Haider-Shah to send him to a hospital, but instead, the doctor told him "not to worry that everything was going to be alright" and sent plaintiff back to the dormitory. *Id.*

Plaintiff states that "the following morning" he went to emergency sick-call because he discovered blood in his stool and a sore on his penis. *Id.*  Plaintiff saw Dr. Haider-Shah, who ordered a urine sample and allegedly laughed at plaintiff's swollen

---

[4] Plaintiff could be trying to say that his "enzymes" were very high.  Plaintiff appears to be referring to his liver enzymes. (Compl. at 5).

face.[5] *Id.*  Plaintiff states that he told Dr. Haider-Shah that it was not funny, and that the State Department of Professional Conduct wanted to speak with him regarding plaintiff's illness and what the doctor was doing about it. *Id.*  Plaintiff claims that the doctor got angry with him and sent plaintiff out of the office. *Id.*

Plaintiff alleges that his condition continued to get worse, his system was beginning to "shut down," and there were times that plaintiff could "not function." (Compl. at 7).  Plaintiff claims that when he went to sick-call again, he saw the doctor, but he also he overheard a nurse saying that plaintiff was in "terrible shape," and that she did not understand why Dr. Haider-Shah did not send plaintiff to the "Hospital." *Id.*  Plaintiff saw Dr. Haider-Shah again on April 3, 2008.[6] *Id.*  Plaintiff states that he was still unable to hold objects, walk long distances, and was having trouble getting up in the morning. *Id.*  Plaintiff states that he was taking sixty milligrams of morphine twice per day.  Plaintiff again asked Dr. Haider-Shah to send plaintiff to the "Hospital" because he believed that the doctor was not "looking out for the plaintiff's best interest." *Id.*

Plaintiff claims that on May 21, 2008, Dr. Haider-Shah told plaintiff that he did not know what was wrong with him, did not know how to help the plaintiff, and that he was sorry that he could not help him. (Compl. at 8).  Dr. Haider-Shah told plaintiff

---

[5] Plaintiff states that his face was swollen due to the medication that Dr. Haider-Shah had prescribed earlier. (Compl. at 6).

[6] This reference is the first time that plaintiff includes a date since he states in the beginning of the complaint that he saw Dr. Haider-Shah for the first time on March 19 or 20 of 2008. (Compl. at 3-7).

he was going to order more blood tests. *Id.*  Plaintiff states that on the same day, he wrote to the New York State Department of Health and Professional Medical Conduct to report Dr. Haider-Shah's failure to give plaintiff proper medical care. *Id.*  Plaintiff states that he was not aware of "all the numerous complaints that were filed against doctor Syed, concerning his failure to give other people and inmates proper medical treatment." *Id.*

Dr. Haider-Shah next examined plaintiff on May 26 or 27, 2008. *Id.*  Plaintiff claims that he was chronically ill, could barely walk, was terribly weak, had a high fever, could not sleep, and his liver enzymes were "off the charts." (Compl. at 8-9). Plaintiff told Dr. Haider-Shah that he was not leaving until the doctor did something to help him. *Id.*  Plaintiff claims that Dr. Haider-Shah called the "clinic officer" to escort plaintiff out of the office, however, for some reason, the officer asked the doctor about plaintiff's condition.  Plaintiff claims that Dr. Haider-Shah told the officer that he did not know what was wrong with plaintiff and could not help him. *Id.* At that time, plaintiff claims that a nurse noticed something wrong with plaintiff's eyes. *Id.*  After Dr. Haider-Shah examined plaintiff's eyes, he told plaintiff that he was sending plaintiff to Mid-State "because there was a medical Specialist coming there on Monday," and Dr. Haider-Shah wanted the specialist to examine plaintiff. *Id.*

Plaintiff states that he was sent to Mid-State the same day over his objection and request to be sent to a "proper Hospital." *Id.*  Plaintiff was examined by a "Specialist" at Mid-State, who took plaintiff off all of his medications. *Id.*  On June 3, 2008, plaintiff claims that he was sent to "SUNY University Hospital" by the medical

staff at Mid-State because plaintiff's condition "had become Critical and Life Threatening." (Compl. at 10).

Plaintiff claims that when he arrived at the hospital, the doctors told him that he was not going to live long and was "placed on 'Hospic'[sic]."[7]  Plaintiff claims that the doctors told plaintiff that defendant Haider-Shah had "waited a long time," and that they did not know if they could help him. (Compl. at 11).  Although plaintiff's condition ultimately improved, he claims that Dr. Haider-Shah's failure to send plaintiff to the hospital caused a variety of conditions, including liver failure, pneumonia, cirrhosis, jaundice, heart problems, and muscle atrophy, to name only a few. (Compl. at 12).

Plaintiff filed this civil rights complaint on January 21, 2009. (Dkt. No. 1).  In his complaint, plaintiff states that he did not file any prison grievances regarding the conduct alleged in the complaint. (Dkt. No. 1 at 2).  Plaintiff originally named Dr. Haider-Shah and the Department of Correctional Services (DOCS) as defendants. (Compl. at 1).  The complaint contains twelve causes of action, most of which are simply various allegations of deliberate indifference by Dr. Haider-Shah,[8] one of which is an attempt to make a claim against DOCS for the denial of constitutionally

---

[7] The court assumes that plaintiff means "Hospice."

[8] Causes of Action Nos. 1-9, 11-12 all refer to various deficiencies in Dr. Haider-Shah's care. (Compl. at 13-26, 30-32).

adequate medical care,[9] and one of which includes both Dr. Haider-Shah and DOCS.[10] (Compl. at 13-32). On February 3, 2009, Senior Judge Scullin issued an order granting plaintiff's motion to proceed *in forma pauperis*, ordering the service of the complaint on defendant Haider-Shah, but ordering dismissal of the complaint against DOCS based on Eleventh Amendment immunity. (Dkt. No. 6). Thus, the only remaining defendant is Dr. Haider-Shah.

## II.   **Motion to Dismiss**

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008)(quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005);

---

[9] Cause of Action No. 10 states that DOCS was named due to its employment of defendant Haider-Shah. (Compl. at 27).

[10] Cause of Action No. 11 appears to claim that "defendants" showed deliberate indifference, although it actually refers only to Dr. Haider-Shah by name. (Compl. at 30-31).

*Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (per curiam).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).  Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell*, 419 F. Supp. 2d 521, 525 (S.D.N.Y. 2006) (citation omitted).

In his motion to dismiss, defendant Haider-Shah argues that plaintiff has failed to state a claim for cruel and unusual punishment, has failed to exhaust his administrative remedies, and argues that he is entitled to qualified immunity from the assessment of damages. (Dkt. No. 9).  Plaintiff argues that the exhaustion requirement should be excused in his case. (Dkt. No. 16-2 at 5-6). This court finds that plaintiff has failed to exhaust his administrative remedies and will thus recommend dismissal of his complaint on that basis.

## III.   Exhaustion of Administrative Remedies

### A.   Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject

matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore*, 2005 U.S. Dist. LEXIS 6070, *12-15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004)).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12-13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 218-19 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.  In *Woodford*, the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c).

10

Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a)(Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at

11

686).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Even after *Woodford*, courts have continued to assume that there are exceptions to the exhaustion requirement, particularly where defendants' conduct is such that they will be estopped from asserting the defense. *See Smart v. Goord*, 04 Civ. 8850, 2008 U.S. Dist. LEXIS 16053, *5-7 (S.D.N.Y. March 3, 2008) (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004) (plaintiff claimed, *inter alia*, that prison officials beat him, threatened him, and denied him grievance forms)); *Amador v. Superintendents of the Dep't of Correctional Svcs.*, 03 Civ. 650, 2007 U.S. Dist. LEXIS 89648, *14-24 (S.D.N.Y. Dec. 4, 2007) (discussing viability of exceptions to exhaustion after *Woodford v. Ngo*).

In *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007), the Second Circuit cited *Woodford*, and also considered whether the defendants' actions would have estopped them from asserting the defense of non-exhaustion.  In *Davis v. State of New York*, the Second Circuit continued to utilize this three-part test to determine whether a plaintiff properly exhausted his remedies.[11] *Davis v. State of New York*, 311 Fed. Appx. 397,

---

[11] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have **not** been overruled in that respect.  In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the **Second** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)) (Breyer, J. concurring).  Justice Breyer then stated that on remand,

399 (2d Cir. 2009).  In *Shariff v. Coombe*, the district court stated that although there was "some doubt" regarding the "viability" of the Second Circuit's three-part inquiry after *Woodford*, it did not address the issue, finding that the plaintiff had not shown that exhaustion should be excused in any event. *Shariff v. Coombe*, 655 F. Supp. 2d 274, 285-86 n7 (S.D.N.Y. 2009). *See also Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, *12 n.3 (S.D.N.Y Feb. 9, 2010) (discussing the lack of a definitive ruling regarding exceptions to exhaustion requirement after *Woodford*).  As discussed below, this court finds that plaintiff has not shown that the exhaustion requirement should be excused, and thus, plaintiff's case should be dismissed regardless of whether exceptions to the exhaustion requirement continue to exist after *Woodford*.

## B.    Application

Plaintiff concedes that he did not file any grievances regarding the medical issues he now raises in this complaint. (Compl. at 2).  Instead, plaintiff argues that he was told that the grievance process could not do anything about medical issues. *Id.* Plaintiff complains that the grievance program does not function in the proper manner. He also was worried that he would be harassed or would not be seen by medical personnel if he filed a grievance. *Id.*  Plaintiff stated that he told his Housing Officer and his Counselor that he was not receiving the proper medical treatment and was told by his Counselor that he "would look into it." *Id.*  In his memorandum in opposition to defendant's motion to dismiss, plaintiff claims that he did not have to exhaust his

---

the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a ***traditional exception that the statute implicitly incorporates***." *Id.* (emphasis added).  This statement implies that there are still exceptions that a court may consider.

13

administrative remedies because his life was in jeopardy, and that if he had exhausted his administrative remedies, he would not be here today. (Pl. Mem. at 5) (Dkt. No. 16-2).

There is no question that the grievance process was "available." Plaintiff does not state that Dr. Haider-Shah or any other corrections official prevented him from filing a grievance, only that some unspecified individual told him that he could not grieve medical issues. Plaintiff's claim is completely conclusory and without foundation. His mistaken belief that the grievance process would not help him, would have been ineffective, or futile is not sufficient to excuse him from the exhaustion requirement. *Shariff*, 655 F. Supp. 2d at 286. His allegation that he mentioned the lack of proper treatment to a Counselor, and was told that he would "look into it," is insufficient to constitute proper exhaustion. *See Macias v. Zenk*, 495 F.3d at 42-44 (informal complaints insufficient for proper exhaustion).

Plaintiff also claims that he did not exhaust his administrative remedies because his life was in jeopardy. However, plaintiff does not explain why exhausting his administrative remedies would have created a greater delay, would have made his medical condition worse, or would have created a greater danger than he was already allegedly facing. In fact, if plaintiff had filed a grievance regarding his medical care, he might have obtained an investigation, and perhaps he could have been treated sooner if appropriate. This action was not filed until January of 2009, while a grievance would have been filed contemporaneously to the care he was receiving. Thus, plaintiff has not established any special circumstances to justify excusing the

exhaustion requirement and this action should be dismissed for failure to exhaust administrative remedies.[12]

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendant's motion to dismiss (Dkt. No. 9) be GRANTED and the complaint be DISMISSED IN ITS ENTIRETY based on plaintiff's failure to exhaust his administrative remedies.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing

---

[12] Without making any substantive findings regarding plaintiff's medical care, the court would point out that plaintiff himself states that he first saw defendant Haider-Shah on March 19 or 20, 2008, and that the doctor sent plaintiff to a specialist almost immediately. (Compl. at 3-4). From the allegations in the complaint it appears that between March 19 or 20 and April 3, 2008, Dr. Haider-Shah examined plaintiff approximately eight times. (Compl. at 3-7). Plaintiff was transferred to Mid-State on May 27 or 28, 2008. (Compl. at 9). Plaintiff states that Dr. Haider-Shah was "sorry" that he could not help plaintiff, and he had plaintiff transferred to Mid-State because a specialist was scheduled to be there who could examine plaintiff. (Compl. at 8-9). Plaintiff states he was transferred "the same day" that Dr. Haider-Shah told him he was being transferred. (Compl. at 9). The court does not wish to minimize plaintiff's condition or his rapid deterioration. However, in order to rise to the level of a constitutional violation, the defendant must have been deliberately indifferent to plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, based upon the complaint alone, it is unlikely that plaintiff would have been successful in raising a constitutional claim regarding his medical care.

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  March 2, 2010

_Andrew T. Baxter_

Hon. Andrew T. Baxter
U.S.  Magistrate Judge

16